1   UNITED STATES BANKRUPTCY COURT
2   WESTERN DISTRICT OF NEW YORK
    ─────────────────────────────

3   IN RE:

4     NIAGARA FRONTIER HOCKEY, LLP,
                                            BK #03-10210
5              Debtor.

6
    ─────────────────────────────
7

8               Proceedings held before the

9   HONORABLE MICHAEL J. KAPLAN, United States

10  Bankruptcy Court Judge, taken in Suite 350, Part I

11  of the courthouse at the OLYMPIC TOWERS, 300 Pearl

12  Street, Buffalo, New York, on March 30, 2004,

13  commencing at 10:08 A.M.

14

15

16  APPEARANCES:        NIXON PEABODY, LLP,
17                      BY: WILLIAM S. THOMAS, ESQ.,
                        Clinton Square, P.O. Box 1051,
                        Rochester, New York 14603,
18                      Appearing for the Debtor.

19                      HANCOCK & ESTABROOK, LLP,
20                      BY:  CAMILLE HILL, ESQ.,
                        1500 MONY Tower I, P.O. Box 4976,
                        Syracuse, New York 13221-4976,
21                      Appearing for Creditors' Committee.

22                      ZDARSKY, SAWICKI & AGOSTINELLI,
23                      BY: MARK J. SCHLANT ESQ.,
                        404 Cathedral Place,
                        298 Main Street,
24                      Buffalo, New York,
                        Appearing for Fleet Bank.
25

1                     PHILLIPS, LYTLE, HITCHCOCK,
                      BLAINE & HUBER,

2                     BY:  WILLIAM J. BROWN, ESQ.,
                     3400 HSBC Center,

3                     Buffalo, New York,
                     Appearing for the HSBC Bank.

4

5                     UNDERBERG & KESSLER, LLP,
                     BY:  JANE F. CLEMENS, ESQ.,

6                     1900 Main Place Tower,
                     Buffalo, New York,

7                     Appearing for Hockey Western
                     New York.

8                     HODGSON RUSS, LLP,
                     BY:  CHERYL R. STORIE, ESQ.,

9                     1300 Guaranty Building,
                     Buffalo, New York,

10                   Appearing as special counsel
                     to the Committee.

11

12 APPEARING TELEPHONICALLY:

13                   WILKIE FARR & GALLAGHER, P.C.,
                     BY:  ROGER NETZER, ESQ.,

14                   Appearing for Adelphia debtors.

15                   SALOMON, GREEN & OSTROW,
                     BY:  CHESTER SALOMON, ESQ.,

16                   and JOCELYN KEYNES, ESQ.,
                     Appearing for Key Bank.

17                   KASOWITZ, BENSON, TORRES
                     & FRIEDMAN, LLP,

18                   BY:  DANIEL ZINMAN, ESQ.,
                     Appearing for Adelphia

19                   Creditors Committee.

20 PRESENT:            BARBARA BUYERS, CSR, RPR,
                     Court Reporter.

21

22                 THE COURT:       Let's note the

23 appearances in the courtroom, please.

24                 MR. THOMAS:      William

25 Thomas, Nixon Peabody, for the debtors.

1          MR. BROWN:        William J.

2    Brown, Phillips Lytle, for HSBC Bank.

3          MR. SCHLANT:        Mark Schlant,

4    Zdarsky, Sawicki & Agostinelli, for Fleet

5    National Bank.

6          MS. CLEMENS:        Jane Clemens,

7    Underberg & Kessler, for Hockey Western New

8    York.

9          THE COURT:        That was Ms.

10   Clemens for Hockey Western New York.  She's not

11   near a microphone.

12          MS. HILL:        Camille Hill,

13   Hancock & Estabrook, for the official creditors'

14   committee, to the extent that the issues do not

15   deal with the HSBC Bank.

16          THE COURT:        That was

17   Camille Hill of counsel to the creditors'

18   committee here.

19          MS. STORIE:        Cheryl Storie,

20   Hodgson Russ, special counsel to the committee

21   insofar as it concerns HSBC's claim.

22          THE COURT:        Thank you.

23   Ms. Storie for HSBC -- I'm sorry, for --

24          MS. STORIE:        Special

25   counsel to the committee.

BUYERS & KACZOR REPORTING SERVICES, INC.
(716) 852-2223

1            THE COURT:      Special

2  counsel to the committee.

3            The reporter thought we were just

4  finding out who was on the phone.

5            MR. NETZER:     Roger Netzer

6  from Wilkie Farr on behalf of Adelphia.

7            THE COURT:      Thank you.

8  Mr. Zinman?

9            MR. ZINMAN:     Dan Zinman

10  from Kasowitz, Benson, Torres & Friedman, on

11  behalf of the Adelphia creditors' committee.

12           THE COURT:      Thank you.

13  And either Mr. Salomon or Ms. Keynes?

14           MR. SALOMON:    Chester

15  Salomon and Jocelyn Keynes for Key Bank.  We're

16  with Salomon, Green & Ostrow.

17           THE COURT:      Thank you.

18  Okay.  Mr. Thomas?

19           MR. THOMAS:     Your Honor,

20  just for housekeeping, a couple details.  As we

21  previously said and with the consent of the

22  parties, a separate motion to submit a

23  stipulation and agreed order, and a motion made

24  by HSBC, have both been adjourned without

25  prejudice at the time of the pretrial later

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document  , Page 4 of 65

1  today.  The parties have agreed we will set up a

2  date when those things --

3  THE COURT:        Let me, for

4  the minutes, because we have so many matters

5  showing up on the docket today, for the minutes,

6  let me be specific as to what those matters

7  were, by document number, if I have the document

8  numbers.

9  So we have here the HSBC Bank

10  motion, which is -- here it is.  It's a motion

11  dated March 22nd.  It was received here March

12  the 23rd.  I don't have a document number, and

13  it was a motion by HSBC Bank returnable today at

14  ten for an order enforcing Section 7 dot 06 of

15  the plan and certain other relief.  So that

16  motion, which I believe resulted in at least one

17  opposing document, is by the debtors, has been

18  adjourned and will make a further order on that

19  later?

20  MR. THOMAS:        That's part of

21  the pretrial, Your Honor.  That was part of the

22  agreement of the parties, if that's all right

23  with you.

24  THE COURT:        The other was

25  the motion by the debtors to approve a

1     stipulation with certain Adelphia parties.  This

2     motion is document number twelve, and that would

3     be to approve a stipulation and agreed order

4     that, among other things, would dismiss out the

5     Adelphia parties from AP 03 dash 1292.

6     Obviously, that motion is not compatible with

7     HSBC's motion and perhaps some other -- now

8     Mr. Schlant, you had a motion to intervene in

9     that AP.

10                    MR. SCHLANT:      Yes.

11                    THE COURT:        Is that also

12    being adjourned?

13                    MR. SCHLANT:      I had not been

14    asked to do it.  I have not received any

15    opposition.  I assumed it was going forward

16    today.

17                    THE COURT:        It was a

18    document consenting and joining from HSBC, from

19    Mr. Brown.  Is that going forward today,

20    Mr. Thomas?

21                    MR. THOMAS:       I believe so.

22    The debtor has no objection to that.

23                    THE COURT:        Okay.  Hold on

24    a minute, then.  Let me find that.  Let me see

25    if I can help make the minutes straight on that.

1    Okay.  It's document number fifteen is the

2    motion by Fleet for leave to intervene in the

3    AP.

4                There subsequently was received,

5    on March the 25th, a consent and joinder of HSBC

6    in that motion.  The debtor does not oppose.  Is

7    there anyone else who wishes to be heard in

8    connection with that motion?

9                MR. ZINMAN:        Your Honor,

10   Dan Zinman from Kasowitz, Benson, Torres &

11   Friedman.  We have no opposition to the motion

12   to intervene except to say that there were

13   certain allegations made in there that might

14   conceivably have some impact on jurisdictional

15   questions and we reserve the right to dispute

16   those allegations at the appropriate time.

17                THE COURT:        Fine.

18   Anything else?  Then the motion to intervene is

19   granted.  You may submit the order, Mr. Schlant.

20                MR. SCHLANT:        Thank you.

21   All right.

22                MR. THOMAS:        Now, the

23   matter remaining on the calendar, Your Honor, is

24   the motion made March 19th by the debtor for

25   authorization and direction to disburse funds

1    from the segregated account.

2              THE COURT:          Okay.  Hold on

3    a minute, because there's one other matter that

4    is housekeeping, and I do want to get it behind

5    us.

6              There is a couple of adjourned

7    claims objections on, Fiesta, Latina & Atwood.

8    We received a note from Mr. Mascitti that those

9    had been settled.  Would there be orders to be

10   submitted?

11             MR. THOMAS:          Yes.  We will

12   be submitting orders, Your Honor.

13             THE COURT:          Mark those

14   settled, please.  Those were -- can you tell

15   from this whether there were others besides

16   those two that were on?

17             CHRISTINE KLIMKO:   I think there

18   were just those two.

19             THE COURT:          I'll give you

20   the claim numbers, then.  Fiesta, Latina &

21   Allwood, not Atwood.  And those are claims 109

22   and 271.  So those are settled and the orders

23   are to be submitted.

24             MR. THOMAS:          I'm also

25   pleased to inform the Court that all of the

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document  , Page 8 of 65

1    claims that were subject to the first objection,

2    the second objection have, in fact, been

3    resolved and there are no outstanding claims

4    objections that have not already been settled,

5    merely pending submission of an order.

6            THE COURT:        Good.  Thank

7    you.  Now again, to make sure that we're all on

8    the same page, Mr. Thomas is saying that what is

9    still on right now is a document that has been

10    assigned, document number 425, it is the notice

11    of motion by the debtors and debtors-in-

12    possession for authorization and direction to

13    disburse funds from a segregated account.

14            Now, that motion elicited some

15    other-filed documents.  One is the reply of HSBC

16    Bank, USA, to that motion.  I don't have a

17    document number, because I have only a chambers

18    copy, either that or it was e-filed and it would

19    not necessarily come to me with a document

20    number.  It was dated March 29, 2004.  It was

21    e-filed by Mr. William Brown.

22            Then I received a similar response

23    from Key Bank and its counsel, Mr. Salomon and

24    Ms. Keynes, which references the HSBC response,

25    and then I received a somewhat similar response

1    from Fleet through its local counsel,

2    Mr. Schlant.

3                    Let me just make sure that that's

4    everything in connection -- then I received the

5    debtor's response to the HSBC reply.  That was

6    just handed up today.  I don't have a document

7    number on that.  That was dated March 29.  I

8    think that's everything I have.

9                    MR. THOMAS:        It's

10   everything I've been served with, Your Honor.

11                   THE COURT:         Anybody think

12   I'm missing something?  Okay.  All right.

13                   I've read all the papers.  The

14   nature of the HSBC objection is -- it is limited

15   and it's such as to oppose the segregation

16   unless there is something in the nature of a

17   credit given to HSBC; a credit up to the one

18   point six million.

19                   It was a credit that, according to

20   Mr. Brown's papers, HSBC requested directly from

21   the Adelphia parties.  It was not obtained

22   consensually, and HSBC opposes the distribution

23   of the segregated account unless it is, by order

24   of the Court, given a credit.  The debtor's

25   response to that objection argues that that

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document , Page 10 of 65

1  would be premature.  It's a two-party dispute,

2  in the debtor's view, between the Adelphia

3  entities and HSBC.

4           The Key Bank response was very

5  similar to the HSBC Bank response, and sought a

6  similar form of relief.  The Fleet was somewhat

7  different.  Mr. Schlant?

8           MR. SCHLANT:        Your Honor, I

9  believe, if anything, the difference is just at

10  the end of the document, we did not say that we

11  oppose it unless it comes with a credit.  But in

12  the document, we've said that.

13           THE COURT:        Okay.

14           MR. SCHLANT:        We're taking

15  the same position.  Some of our legal arguments

16  are a little additional or different, but we are

17  asking for the same thing.

18           THE COURT:        Okay.  Thank

19  you.

20           MR. BROWN:        Your Honor,

21  it's a contingent credit, and I think that's

22  the --

23           THE COURT:        Oh, it's a

24  continuing credit.

25           MR. BROWN:        Contingent.

1    It effectively is a contingent credit because it

2    bears the outcome of the proceeding.

3              THE COURT:          Okay.  I sense

4    that that may have been lost on the debtor's

5    counsel, because they came back arguing that

6    it's premature.

7              MR. BROWN:          Well, it's

8    only if.  It's only to the extent that there is

9    a recovery in the so-called Adelphia AP.

10             MR. THOMAS:          Let me just

11   address that.

12             THE COURT:          So the other

13   extent to which I thought Fleet papers were

14   different, apparently the Fleet papers came in

15   after -- well, I'm not quite sure whether they

16   came in after the debtor's reply to the HSBC

17   papers or not, but the Fleet papers purport to

18   make an argument that HSBC and Key do not argue,

19   but I don't know -- and that has to do with what

20   Fleet believes are independent rights to pursue

21   these debtors; not rights that would be

22   derivative of a judgment in favor of Adelphia.

23   I don't know whether Fleet is situated

24   differently in that regard from HSBC and Key or

25   not.

1              MR. BROWN:        That's raised

2    in footnote three of the HSBC reply.

3              THE COURT:        Okay.

4              MR. BROWN:        We share the

5    same type of club provisions that are direct

6    claims against these debtors.

7              THE COURT:        Okay.  So I

8    think that that is the capsuled description of

9    the issues that have been joined before me this

10   morning.  Mr. Thomas?

11            MR. THOMAS:        Yes, Your

12   Honor.  Just in fairness to all the parties,

13   attached to our response is a proposed order and

14   what we're really talking about here, to a

15   certain extent, is settling an order that I

16   believe all of the parties, including the banks

17   and the Adelphia debtors and others, are in

18   favor of these funds being distributed to the

19   relatively minor creditors, so that they can be

20   paid as Mr. Golisano intended when he executed

21   the purchase agreement.

22            THE COURT:        The order

23   recites that there's been no opposition.  Was

24   that --

25            MR. THOMAS:        I circulated

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document , Page 13 of 65

1   this around to everybody and hope springs

2   eternal that perhaps people would agree.

3   Certainly, I'll have to -- the reason I haven't

4   brought an order with me today was that I would

5   have to put in all these various objections.

6              The debtor's view, and to a

7   certain extent this is a discussion that has to

8   take place between the banks and the Adelphia

9   people as well.  In my attempt to broker a deal,

10  the debtor's position was until the litigation

11  in the Adelphia Sabres matter is resolved, these

12  claims are not only unsecured non-priority and

13  contingent, they're hotly disputed.

14             Each of the banks maintain that

15  they do not, in fact, owe any of this money.

16  HSBC has been sued for twelve point six million,

17  Key's been sued for four point seven million and

18  Fleet's been sued for thirty point five million.

19             If they were successful, I don't

20  believe there's any objection that their rights

21  would share pro rata, with the exception of some

22  adjustment in regard to the concession loan,

23  which is a matter involving Fleet only.  The

24  debtor's sole condition is it was a precondition

25  to any of these claims being asserted against

1    this estate that a judgment has to be awarded in

2    the Adelphia AP or in the AP that is pending

3    before this Court, and therefore, we believe

4    that whatever relief any of these banks are

5    entitled to can be given in respect of the award

6    at that time by that Court, and therefore,

7    remember, keep in mind that what we're really

8    talking about is that the million six will leave

9    the jurisdiction of this court, be distributed

10   to creditors. So the only question is, are the

11   banks prejudiced by the release of those funds.

12            The debtor's position is that if,

13   in fact -- since, in fact, they are not

14   presently liable and could potentially only be

15   liable, the only risk that they run which this

16   Court can resolve by entering an order is to say

17   that if it's determined, for example, that HSBC

18   were liable for ten million dollars and HSBC

19   establishes a right to a setoff, the million six

20   can be deducted, or its pro rata share, from the

21   award and therefore, HSBC is at no risk until

22   that point.

23            This money need not be held up

24   because all the banks will have available to it,

25   through either the Adelphia AP or the Sabres AP,

1　complete and total relief before that court at

2　that time.

3　　　　　　That's consistent with our view

4　that the Adelphia debtors have agreed, number

5　one, in the stipulation that we've submitted to

6　the Court that they continue to be bound by the

7　stipulation and the order, and it's our view

8　that that stipulation and order runs with the

9　land, as it were.  It runs with those

10　obligations.

11　　　　　　So for example, if a debtor were

12　to sue somebody over the transfer of a piece of

13　property and after the transfer occurred, the

14　property was polluted, then it was an attempt to

15　return it, there would be an offset generated.

16　It would be either an affirmative defense, a

17　counterclaim or an offset.  And the court

18　handling the particular adversary proceeding

19　could work that out completely.

20　　　　　　That said, our goal, and I believe

21　the goal of the new Sabres, is to distribute

22　these funds to the smaller creditors as quickly

23　as possible.  If I were able to draft a more

24　detailed way to deal with the setoff issue or

25　non-setoff issue, I would have done that.  I'm

1    nervous as to what I would do, at the end of the

2    day, what we would merely ask this Court is

3    certainly to preserve and protect all of the

4    claims, defenses, offsets of the bank; all of

5    the claims, offsets and defenses of the Adelphia

6    debtors and simply allow us to distribute these

7    funds and move towards wrapping up that aspect

8    of the case.  Thank you, Your Honor.

9                    THE COURT:        Okay.

10   Mr. Brown?

11                   MR. BROWN:        I guess I'd

12   ask first, Your Honor, if there's anybody else

13   speaking in support.

14                   THE COURT:        In favor?

15   Sure.

16                   MR. BROWN:        Of the

17   debtor's motion.

18                   THE COURT:        Could I hear

19   argument to those in support?  Ms. Storie?

20                   MS. STORIE:       Your Honor,

21   simply on behalf of our special counsel, again

22   appearing on behalf of the committee in a

23   special counsel capacity, solely with respect to

24   the HSBC claim, that constituency supports the

25   debtor's motion and asks that the Court grant it

1  over the objections of HSBC.

2                    THE COURT:          Thank you.

3  Ms. Hill, as to the matters that do not pertain

4  to HSBC?

5                    MS. HILL:          Yes, Your

6  Honor.  I believe the Court is aware of our

7  position with regard to the committee --

8                    THE COURT:          I had

9  forgotten it when we began, but then when Miss

10  Storie spoke, I remembered it.

11                    MS. HILL:          We're speaking

12  solely to those matters that do not impact HSBC

13  and we do not take a position in regard to those

14  matters.  However, we're in a capacity

15  representing the trade vendors and the small

16  creditors Mr. Thomas alluded to would like to

17  get paid.  And to that extent, we do support the

18  debtor's motion so we have those creditors paid

19  from this fund at this time.

20                    THE COURT:          Thank you.

21  Miss Clemens?

22                    MS. CLEMENS:          On behalf of

23  Hockey Western New York, Hockey Western New York

24  fully supports the debtor's motion, ask the

25  Court to enforce the purchase agreement and the

1    original intent of the purchase transaction and

2    permit the distribution to the creditors,

3    reserving the bank's rights later to dispute

4    credits or offsets.  Thank you.

5              THE COURT:        Thank you.

6    And is there anyone participating by phone who

7    would support the debtor's proposal?

8              MR. ZINMAN:        Adelphia

9    supports it.

10             THE COURT:        Thank you.

11    Then since I know that I had limited opposition

12    from Key Bank, HSBC and Fleet Bank, let me turn,

13    now, to their positions.  Mr. Brown?

14             MR. BROWN:        Thank you,

15    Your Honor.  What brought havoc to this case,

16    this Chapter 11 case pending before Your Honor

17    was, no one, other than Adelphia and its

18    creditors' committee, having fully participated

19    in the Chapter 11 case before Your Honor, and

20    Adelphia having been involved in the

21    negotiations leading to the sale, and in fact at

22    the sale hearing, which I suspect Mr. Schlant

23    will address in greater detail, in fact

24    negotiated and paid one of the three loans in

25    dispute, the concession loan and thereafter,

1    after the sale in the following summer,

2    commences an adversary proceeding seeking to

3    recover payments made not only on the

4    construction loan made to the Knox brothers

5    essentially in 1995, but the concession loan to

6    which Adelphia consented to be paid out in full

7    in April, 2003. And the payoff balance

8    presumably taking into account the installment

9    payments that Adelphia and its creditors --

10          THE COURT:     Back up.

11    Adelphia permitted who to pay off what?

12          MR. BROWN:     As part of the

13    NFHLP sale process, the team was sold in a

14    generic fashion.

15          THE COURT:     Right.

16          MR. BROWN:     The arena down

17    the street was sold, and many other assets.

18          THE COURT:     Yes.

19          MR. BROWN:     And we

20    thought, and Your Honor knew that we thought

21    Western New York and Southern Ontario had

22    benefitted by a transaction in which old and new

23    Sabres participated, the National Hockey League,

24    Adelphia appeared before Your Honor, both by New

25    York City counsel and by local counsel,

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document , Page 20 of 65

1    Mr. Lawson.

2          There were joint jurisdictional

3    stipulations and orders entered by yourself and

4    Judge Gerber in January and February of that

5    year that essentially said we will not allow

6    there to be dueling bankruptcies. We will allow

7    Adelphia to come to Judge Kaplan's court to deal

8    with all issues relating to the Sabres and the

9    related assets. And based upon that transaction

10    in April, 2003, one of the disputes lingering on

11    the sale hearing date was whether the concession

12    loan, made in 1995, had to be paid off in full.

13          We, on the one hand, were opposing

14    the assumption of that loan. And as part of the

15    sale process, Adelphia and the old Sabres and

16    the old CALLC agreed that that loan would be

17    paid off in full and we arrived at and agreed

18    upon a payoff amount.

19          Presumably, that payoff amount

20    included the installment payments that Adelphia

21    and its creditors' committee now seek to

22    recover.

23          So was the payoff balance

24    incorrectly agreed to? It would appear so, from

25    Adelphia's point of view after having allowed

1    Your Honor to enter an order which has become
2    final.  At no time during the pendency of the
3    NFHLP and CALLC and associated cases, was there
4    ever an assertion, wink and nod, innuendo that
5    there was anything wrong or anything to be
6    pursued about the recovery of payments made
7    since 1995 through the history of those loans
8    originally made to the Knox brothers when they
9    were owners of the team.  And there's no
10   question there's a hundred and twenty-million-
11   dollar arena down the street constructed with
12   those monies.

13              Focusing on NFHLP's reply
14   essentially to HSBC -- which is essentially a
15   reply to Fleet and Key, because the issues are
16   the same or very similar -- there's still no
17   objection filed to the HSBC or Key Bank claims.
18   There has been no objection filed.

19              THE COURT:          Procedurally,
20   there's been an adversary proceeding commenced
21   seeking, among other things, to subordinate any
22   such claims.

23              MR. BROWN:          That's right.
24   It's not characterized that way.  It's
25   characterized a declaratory judgment to declare,

1    essentially, that what was done among the old

2    Sabres, Adelphia and other parties, not

3    including the banks, is binding on the banks.

4    But as Your Honor knows, if you wish to oppose a

5    subordination, Rule 7001 requires an adversary

6    proceeding and notice.

7                    We have a fundamental due process

8    issue here, and unfortunately, while HSBC and

9    the other banks have proposed a way to allow

10   what we call the little creditors to be paid by

11   the allowance of a contingent credit in the

12   amount of the segregated fund, that,

13   consensually, has not been achieved.

14                    But going back is a significant

15   due process issue.  The declaratory judgment

16   filed by NFHLP is not the form they're

17   seeking -- that they're attempting to use to

18   affect a distribution which would be the correct

19   procedural posture in which to do this, because

20   the banks are entitled to have the due process

21   attributes of an adversary proceeding for the

22   imposition of a subordination or any declaration

23   that is binding, not motion practice.

24                    The hanky panky, in my view,

25   that's been brought to this court or been

1    brought to the larger situation has been caused

2    by out-of-town parties and I'm concerned, as a

3    matter of practice, that the view somewhat by

4    Adelphia and its creditors' committee continues

5    to be that it doesn't matter what Judge Kaplan

6    ruled; we can bring claims related to what that

7    court did and in fact, including payments that

8    were made under an April, 2003 order, and that

9    type of practice I don't think is the practice

10   that's been condoned in any federal court that I

11   know of, knowingly, and I would hope it would

12   not be condoned here.

13            The Adelphia got its consideration

14   that it wanted and negotiated for in the sale of

15   the Sabres and the arena.  It included such

16   things as getting off of a very expensive letter

17   of credit and other obligations that existed; it

18   got off of the obligation to continue to fund

19   the team, it got a new T.V. contract and a

20   number of other things.  It decided how it was

21   going to negotiate for the sale.  I just view

22   this as a bad lesson to teach.

23            Mr. Thomas' arguments that the

24   clawbacks are not applicable here are an

25   evidentiary issue.

1             THE COURT:          Clawback,

2 C-L-A-W-B-A-C-K.

3             MR. BROWN:        The documents

4 have express provisions, and if NFHLP wants to

5 litigate what those agreements either mean or

6 don't mean, the context to do that is in the

7 adversary proceeding that was brought by NFHLP

8 and to which this issue should be adjudicated.

9 Without taking the exact provisions of those

10 agreements is not an appropriate way to decide

11 that issue. And Mr. Thomas really has not

12 addressed the contractual provisions. He

13 surmises that we only stand in the shoes of

14 Adelphia, which is plainly wrong based upon the

15 documents.

16             Additionally, the NFHLP plan in

17 Article 7 provides for a disputed claims fund

18 and right now, the banks believe we're entitled

19 to that right unless there's a consensual

20 resolution allowing the contingent credit or we

21 litigate the issues appropriately in the NFHLP

22 proceeding. Thank you.

23             THE COURT:        Thank you.

24 Mr. Schlant?

25             MR. SCHLANT:      Thank you,

1    Your Honor.  Your Honor, on behalf of Fleet, I

2    don't want to go too much over the things that

3    Mr. Brown has already said.  I completely agree.

4              THE COURT:          Let the record

5    reflect that I do have a present recollection of

6    our previous hearing in which the -- in which

7    everyone seemed to agree that there's no dispute

8    that the Fleet claims -- that Fleet never, in

9    connection with the Sabres, ever did business

10   with Adelphia, as I recall.  And the Fleet loans

11   were to the previous owners, to the Knoxes, and

12   that those loans were simply assumed by the

13   Rigas -- or by the Sabres when they were

14   acquired by Regas entities, and all Fleet ever

15   did was receive payments in the ordinary course;

16   is that right?

17             MR. SCHLANT:          Well, I want

18   to make sure I understand.  There were three

19   loans.

20             THE COURT:          Yes.

21             MR. SCHLANT:          They were

22   originally with the Knox group.

23             THE COURT:          Yes.

24             MR. SCHLANT:          Two of them

25   were purchased by a Sabres -- or by an Adelphia

1    entity called Sabres, Inc. in the year 2000.

2    One of them, the concession loan --

3            THE COURT:        Wait a minute.

4    Let's be clear, though.  We've lapsed, since the

5    revelations about the Regas -- the alleged Regas

6    improprieties emerged and since the filing of

7    the Chapter 11s regarding various Adelphia

8    entities in the Southern District, we've begun

9    to lapse into a somewhat sloppy practice of

10   recognizing, I guess, that Adelphia has asserted

11   equitable or beneficial claims of ownership of

12   the entities, and the assets of the entities

13   that are debtors here, but you just said that

14   those loans were assumed by Adelphia entities;

15   they weren't.  They were assumed --

16           MR. SCHLANT:       It was an

17   entity called Sabres, Inc.

18           THE COURT:        Right.  They

19   were assumed by entities that are debtors here

20   which have become the subject of Adelphia

21   claims; is that right?

22           MR. BROWN:         Your Honor, in

23   1995, the only --

24           THE COURT:        Why don't you

25   come up to the podium, so that you can be heard

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document , Page 27 of 65

1    to the people on the speaker phone.

2              MR. BROWN:          I'll just lay

3    a factual predicate, proffer, if you will, to

4    the Court.

5              THE COURT:          Yes.

6              MR. BROWN:          Miss Clemens

7    is here and can vouch if I'm right or wrong.

8              In 1995, the what is now known as

9    the HSBC Arena, was constructed with two primary

10   loans.  The first was the construction loan for

11   the obvious purposes of bricks and mortar.

12   HSBC, Key Bank and eventually what is Fleet

13   Bank, were the co-lenders in that loan.  They

14   had an initial principal balance of thirty-five

15   million dollars.  And that, among other monies,

16   public and private, constructed the HSBC Arena.

17   That loan was secured by essentially a first

18   mortgage lien on all of the assets, with some

19   limited exceptions.

20             The second loan --

21             THE COURT:          Give me one

22   moment.  Off the record, please.

23             (Discussion off the record.)

24             THE COURT:          On the record.

25   In 1995, Crossroads Arena, LLC --

1      MR. BROWN:   Better known

2 as CALLC.

3      THE COURT:   CALLC borrowed

4 from HSBC and Key to construct the arena, up to

5 thirty-five million, secured by a first lien on

6 some arena assets, secured by excess ticket

7 proceeds, with the rights, already, of the

8 franchise, the franchise having been owned only

9 by Niagara Frontier Hockey Limited Partnership,

10 a guarantee from Niagara Frontier Hockey Limited

11 Partnership up to twelve million if the

12 franchise were to be moved.

13      MR. BROWN:   It was a

14 guarantee of payment.

15      THE COURT:   And then as of

16 the 30th of September, 1902 -- I'm sorry, 2002,

17 there were twenty-nine point seven million owed

18 on the construction loan.

19      At that point, Fleet was not on

20 that loan, but --

21      MR. BROWN:   They were.

22 They were.

23      THE COURT:   Okay. All

24 right. And then Buffalo Sabres Concession, LLC,

25 borrowed thirty-two point five million from

Case 1-03-10210-MJK Doc 492, Filed 08/11/04 Entered 08/11/04 15:44:05,
Description: Main Document , Page 29 of 65

1   Fleet and others, secured by a first lien on

2   concession -- concession lease and some

3   concession assets and the revenues of the

4   concessions, a conditional guarantee by Niagara

5   Frontier Hockey Limited Partnership in

6   connection with a promise not to relocate, and

7   that guarantee was up to twelve million

8   something.  And there was a takeout agreement by

9   SportService.  And then there was a line of

10  credit of Fleet up to twelve million dollars.

11          MR. BROWN:          In 1995, you

12  had the construction loan and you had the

13  concession loan.  They were the two new deals.

14  The concession loan essentially put the kitchen

15  equipment in the stands in for SportService to

16  prepare and sell food in the arena.

17          There always was existing to the

18  team a line of credit, and that was a line of

19  credit to NFHLP that in 1995, then Marine

20  Midland Bank -- now HSBC -- was the lender;

21  Fleet eventually acquired that loan from HSBC

22  within a couple of years of that, and in the

23  1996/1997 period or approximately.

24          Then we roll forward to March,

25  2000.

1                THE COURT:           Yes.

2                MR. BROWN:          In March,

3    2000, the construction loan, which was again

4    HSBC, Fleet and Key, was assigned to and

5    purchased by Sabres, Inc., a wholly-owned

6    indirect subsidiary of Adelphia Communications

7    Corporation.

8                THE COURT:          All right.

9    Not one of the debtors here?

10               MR. BROWN:         No, Your

11    Honor, but CALLC remained the obligor, which is

12    one of your debtors here.

13               THE COURT:          Okay.

14               MR. THOMAS:        Your Honor, in

15    the prior pleadings throughout, they have always

16    been referred to as ACC Sabres, and Sabres Inc.

17    are the same entity.  In the pleadings that we

18    had to avoid confusion, they were always

19    referred to as ACC Sabres, but they and Sabres,

20    Inc., are the same group.

21               THE COURT:          Okay.

22               MR. BROWN:         Also in March,

23    2000, the revolver loan to the team, the NFHLP,

24    was assigned to Sabres, Inc.

25               THE COURT:          Okay.

1     MR. BROWN:          There was

2    three in March, 2000, there was an agreement for

3    the assignment of the concession loan to Sabres,

4    Inc., but it was not consummated because a

5    condition could not be met, and that condition,

6    as I recall it, was the consent of SportService,

7    who was a guarantor on the loan to the

8    assignment.

9              So that brings us to April, 2003

10   before Your Honor.  CALLC, a debtor in this

11   court, is still an obligor on the construction

12   loan.  Its obligee is now Sabres, Inc.

13              THE COURT:          All right.

14              MR. BROWN:          And to effect

15   the sale of the arena and the sale of the team,

16   Sabres, Inc. in the guise of Adelphia, had to

17   consent because otherwise, those assets could

18   not have been transferred free and clear of

19   liens to Mr. Golisano.

20              THE COURT:          All right.  So

21   Fleet did deal with an Adelphia entity?

22              MR. SCHLANT:          In the manner

23   that was described.

24              THE COURT:          Yes.  As

25   the -- the Adelphia entity was an obligee?

1               MR. BROWN:       But it -- I

2   don't want to speak for Fleet.  HSBC, its only

3   dealing with an Adelphia entity was in March,

4   2000 in a sale of the bundle of loan rights.

5   Sabres, Inc. bought a loan --

6               THE COURT:      Yes.

7               MR. BROWN:       -- that had

8   been made to the Knox brothers.

9               THE COURT:      All right.

10  Thank you.

11              MR. SCHLANT:    And I believe

12  as to those two loans, that's the same with

13  respect to Fleet, they just sold those loans.

14             THE COURT:      All right.

15             MR. SCHLANT:    Fleet did have

16  a separate relationship, which we described in

17  our papers with Adelphia, that had nothing to do

18  with the Sabres.

19             THE COURT:      Right.

20             MR. SCHLANT:    The concession

21  loan, as it came forward, came into this case as

22  an obligation of Buffalo Sabres Concession owed

23  to Fleet.

24             THE COURT:      Correct.

25             MR. SCHLANT:    Fleet had

1    guarantees and security interests supporting

2    that loan.

3               THE COURT:         Correct.

4               MR. SCHLANT:      And as

5    Mr. Brown described before, there was a

6    determination made at a certain point that was

7    passed by all parties as to what it would take

8    to satisfy that loan in full. And with court

9    approval and the consent of parties, including

10   Adelphia, that happened in April of 2003. And

11   at that point, Fleet released its security

12   interests and guarantees, and accepted the

13   payment that was made at that time on the

14   stipulated amount as the correct amount to pay

15   that loan in full.

16              THE COURT:        All right.

17              MR. SCHLANT:     And now, three

18   months later, Adelphia having been silent about

19   this before the Court in April of 2003,

20   commences litigation that's entirely

21   inconsistent with the satisfaction of those

22   loans at that time for those numbers.

23             THE COURT:      You're certain

24   that there are -- that there is a cause of

25   action in the complaint that makes it clear that

1     part of what Adelphia is seeking from Fleet

2     related specifically to the concession loan?

3                MR. SCHLANT:        I'm relying on

4     Fleet's main attorneys for that understanding,

5     Levin, Lubarsky & Feigenbaum.  They're a New

6     York City law firm that was retained with

7     respect to the adversary proceeding commenced by

8     Adelphia.

9                THE COURT:        I recall from

10    earlier submissions, a representation by one or

11    more people that the complaint is hundreds of

12    pages long.

13              MR. SCHLANT:        Yes.  And

14    somewhat vague, but I believe it's their

15    understanding from an analysis of it, and I

16    could have them confirm that if the Court wants

17    that separately confirmed, that the concession

18    loan is part of that.

19              THE COURT:        I don't, at

20    this point, need it separately confirmed.

21             MR. SCHLANT:        Where this

22    leaves Fleet unique in this case is with claims

23    that were before this Court as claims against

24    these debtors, released based upon agreements

25    made and stipulations made by Adelphia at a time

1  when, presumably, it knew it or its creditors'

2  committee knew this adversary proceeding was

3  about to happen, not saying a word about it;

4  Fleet relying on stated facts that would suggest

5  completely otherwise, that once it accepts this

6  payment, it is completely finished with these

7  loans and releasing its collateral and

8  guarantees at that time when it could simply

9  have refused if it knew that this was not going

10  to be payment in full on these loans.

11  Fleet, therefore, is taking the

12  same position that HSBC and Key have taken.

13  Fleet is satisfied to see the million seven paid

14  to the vendors and the smaller creditors,

15  provided that it receives a conditional credit

16  against the possibility of any liability in the

17  Adelphia adversary proceeding, and now to the

18  Sabres responses to that.

19  The Sabres assert that any claims

20  that Fleet would have in this regard arise sort

21  of derivatively of Adelphia's claims, we sort of

22  become part of the body of Adelphia claims, and

23  I oppose that and we've asserted in our papers

24  for three reasons that that is not the case.

25  One is we've cited case law to the

1    Court that demonstrates that when they avoided

2    payment on a loan to a separate debtor is

3    returned to a third party, that the separate

4    debtor's obligation is reinstated.  That's a

5    direct claim, it doesn't depend on Adelphia

6    having claim on the direct claim that arises in

7    favor of the creditor that has to return the

8    payment.

9            Second, HSBC and Fleet has

10   language in its documents that in the event of

11   avoidance, the original obligation is considered

12   unpaid to the extent of that avoidance.

13           Third, we don't believe Adelphia

14   can raid Fleet's claims in this case.  This

15   would not be a knowing waiver, an intentional

16   waiver of a known right.  Adelphia, in April of

17   2003, is before this Court leaving the right of

18   Fleet to assert.  When Adelphia later sues it,

19   which Fleet does not know is going to happen,

20   and if Fleet has to return money based on that

21   lawsuit, that Fleet is going to be held to a

22   waiver because Adelphia is, in April of 2003,

23   waiving it for them the right to make those

24   claims back against the debtor.  It can't be a

25   valid waiver because it's not a known right,

1    Fleet has no right to expect that to happen and

2    therefore, it can't be an intentional waiver.

3          So for all those reasons, we

4    believe that Fleet has direct claims against

5    these debtors -- if it has to return money to

6    the Adelphia creditors' committee in the

7    Adelphia adversary proceeding, and therefore, in

8    this proceeding, Fleet has direct claims against

9    the debtors that should be taken into account at

10    this time, and Fleet has offered to take that

11    into account with the form of credit that we've

12    been discussing.

13          THE COURT:        And who will

14    be addressing the Key Bank?

15          MR. SALOMON:      Your Honor,

16    Chester Salomon for Key Bank. I'll be brief.

17    Aside from our papers and our joinders in the

18    papers of HSBC and Fleet and the arguments of

19    HSBC and Fleet counsel this morning, we really

20    don't have anything to add except this. That

21    our client, at no time, knew of the possibility

22    of litigation being brought against it by

23    Adelphia or the creditors' committee in early

24    2003. Thank you.

25          THE COURT:        Thank you.

1     Other argument from --

2               MR. THOMAS:          Your Honor,

3     just very briefly.  I believe the Court fully

4     understands the issues and has spent the time to

5     read the papers.  But just in response, very

6     briefly, to the arguments made by Fleet.

7     Certainly not our position that any of the banks

8     waive our rights.

9               Certainly it's our position that

10    Adelphia signed a subordination agreement and

11    the result of that subordination agreement

12    adheres to the benefit of the banks in the

13    Adelphia AP and in the Sabres AP, and therefore

14    the banks will get full and adequate relief in

15    regard to that.  We're not suggesting the banks

16    waive their rights; we're saying that if, in

17    fact, as a result of the actions that the

18    Adelphia debtors took in this proceeding,

19    there's a million six that could have otherwise

20    been available to the banks, the Court, at a

21    subsequent date, can resolve that issue.

22              Secondly, with regard to the issue

23    of direct claims in both HSBC's papers as well

24    as Fleet's papers, irrespective of whatever the

25    rights may be of a party who is sued for a

1    fraudulent conveyance in the Sabres AP to

2    recover rights back and to have a claim within

3    that, that is totally unrelated to their rights

4    to assert such claims against the debtors in

5    this proceeding.

6         This loan is sold in 1999.

7    Whether it's a fraudulent conveyance or not, I

8    have no opinion, I have no way of knowing, no

9    knowledge.  If it's, in fact determined, after

10   adjudication, to be a fraudulent conveyance, I'm

11   comfortable that whatever results accrue from

12   the execution of the stipulation and order in

13   this case can be adjudicated at that point as a

14   settlement.

15        Finally, with regards to the

16   debtor we have a limited purpose here and

17   suggest the Court is left with three

18   alternatives.  The first, which I don't think

19   anyone here favors, is to hold the three point

20   six million dollars in place until all these

21   matters --

22             THE COURT:        One point six.

23             MR. THOMAS:       One point six,

24   excuse me, Your Honor, one point six million

25   dollars until all these matters are resolved.

1    Secondly, the Court can take the middle

2    position, which is that it can allow the

3    distribution to go forward, reserve all of the

4    rights for all of the parties for another day,

5    and the third position is to adopt the position

6    of the banks and either adjudicate this today

7    or, in the alternative, since there are various

8    matters that are being adjourned and will be

9    resolved shortly, would be to put the banks and

10   the Adelphia debtors on an agreed-upon briefing

11   schedule and allow the issue of whether they're

12   entitled to a setoff today as opposed to at the

13   time of the adjudication of the cases to be

14   decided, but not to allow that issue to hold up

15   the distribution of the funds at this time.

16   THE COURT: All right.

17   MR. THOMAS: Thank you,

18   Your Honor.

19   THE COURT: Does

20   Adelphia's representative wish to be heard?

21   MR. ZINMAN: Yes. This is

22   Dan Zinman from Kasowitz, Benson, Torres &

23   Friedman. Just a few points. I believe it was

24   HSBC's counsel, I have a few comments to --

25   responses to his comments.

1    First, we object to the

2    characterization of the so-called joint orders

3    regarding jurisdiction, as we will not have

4    dueling bankruptcy cases. The orders speak for

5    themselves. We don't believe that they are

6    necessarily as broad, should be read as broadly

7    as HSBC. Clearly, we can argue about that at

8    the appropriate time.

9         Also, any allegation that we don't

10   care what Your Honor did earlier or presumably

11   what we did in conjunction so ordered by Your

12   Honor, or rather Adelphia, not the creditors'

13   committee, but the Adelphia debtors, obviously

14   that's not true. Again, in HSBC's desire to

15   argue its case, it seems to be making this into

16   something about an insulting action, and all

17   they're doing is mischaracterizing what is, in

18   essence, a simple jurisdictional dispute between

19   their desire to have issues heard in your court

20   and our desire to have the first issues heard in

21   the first filed action in the Southern District

22   of New York. And again, we can reserve all our

23   rights to dispute all these issues in the

24   appropriate matter at the appropriate time.

25        THE COURT:    Thank you.

1    Mr. Netzer, did you have anything to add?

2             MR. NETZER:      No, I'll let

3    the creditors' committee remarks stand.

4             THE COURT:      All right.

5    All right.  One question in my mind, in

6    connection with the argument that the procedure

7    being utilized by the debtors here in this court

8    fail -- would fail, I guess, is the answer, of

9    due process, if this Court were not to grant the

10   credit that the banks seek, raises a question in

11   my mind about due process to Adelphia if I were

12   to -- shall I say the -- whether any order that

13   adjudicated in favor of the bank's credit would

14   similarly be argued by Adelphia for one of

15   jurisdiction.

16           MR. BROWN:      Your Honor,

17   this is Bill Brown, for those on the phone.

18   Your Honor, we, HSBC, consents to you and Judge

19   Gerber, if you so choose, speaking about the

20   appropriate jurisdiction of allocations here to

21   the extent that you believe it.  With regard to

22   your question, however, Adelphia appeared in

23   this Court on the sale, on the plan issues, and

24   these are germane to those.

25           THE COURT:      So if I

1   understand, then, this portion of the argument,

2   the argument is that it would violate due

3   process for the Court to approve the debtor's

4   proposal unless the Court were to grant the

5   credit, but that it would not violate due

6   process for the Court to approve it on the

7   condition that the credit is granted?

8            MR. BROWN:          The latter

9   point is really for the purposes of a hoped-for

10  consensual resolution.  Speaking for HSBC, we

11  want to make it clear that HSBC is willing to

12  have the money released, and therefore the small

13  vendors paid, as long as to some small amount,

14  the fact that it has a claim is recognized here

15  and allowed for on a contingent basis, and

16  therefore, we would avoid, at this point, a

17  lengthy adjudication about -- or more lengthy,

18  at least, about whether the subordination is

19  apropos, or whether the distribution has to wait

20  until a later date because, for example, Your

21  Honor, in this four hundred, four hundred and

22  fifty-defendant complaint, HSBC has no other

23  involvement to all of the allegations in that

24  complaint.  They all relate to lenders who lent

25  money to Adelphia.  And we're not similarly

1    situated with those people.

2         If Adelphia had come to us in some

3    fashion in January, 2003 and said, hey, we've

4    got a problem with the installment payments that

5    CALLC made to you going back to 1995, or the

6    fact that you sold the loan to Sabres Inc. in

7    2000, then HSBC and its fellow construction

8    lenders would have been in a position, in the

9    spring of 19 -- of 2003 to be the counter

10   parties with Mr. Golisano before those liens

11   were released.

12        THE COURT:        Okay.  But

13   those are good arguments for why you should

14   maybe, eventually, be able to reach a consensual

15   resolution of the Southern District Bankruptcy

16   Court litigation as to HSBC, in any event.

17        My immediate concern is how to get

18   this done in a way that is respectful of the

19   fact that it might -- if push were to come to

20   shove over the issue of jurisdiction to grant a

21   credit, it could require an evidentiary hearing;

22   it could require -- because it may involve

23   issues of judicial estoppel, and issues of

24   judicial estoppel sometimes involve evidentiary

25   hearings, and I would want to be respectful in

1    what I do of the fact that while I'm certain

2    that Judge Gerber and I would be able to agree

3    on how to proceed on those issues, I do not want

4    to -- I don't want to bat heads with him.  Go

5    ahead.

6              MR. BROWN:           Well, Your

7    Honor has done that successfully before, and

8    Laidlaw is a prime example.  And there are other

9    cases, and we're perfectly willing to allow Your

10   Honor to engage in that consideration.  But on

11   that very subject, I thought that's what NFHLP's

12   adversary proceeding was for.  Adelphia and its

13   creditors' committee are parties to that

14   adversary proceeding in this court; they have

15   not answered.  Now they seek to be dismissed.

16   We have cross-claimed against them and so has

17   Fleet.

18             MR. THOMAS:           Your Honor, in

19   response to the narrow question of due process,

20   it would be the debtor's position, we made an

21   effort to draft the order accordingly, that if

22   the distribution is approved, it's without

23   prejudice of any and all rights, remedies,

24   claims including the right to argue that the

25   Court lacks jurisdiction in regard to other

1    matters.

2              I would also be happy to put in

3    the order, if it makes the Court more

4    comfortable, and other parties more comfortable,

5    that this is without prejudice to the bank

6    seeking the same relief requested here; that the

7    relief they have requested is not being denied

8    with prejudice in any way.

9              We're simply distributing the

10   money which I understand the banks at the end of

11   the day don't dispute, and therefore the issue

12   of whether the credit should be issued

13   immediately or shortly hereafter, can be

14   resolved and if it does take some sort of

15   evidentiary hearing, it will not hold up the

16   distribution.

17             So my view is that if the Court

18   were to grant this order, it is not necessarily

19   deciding -- it is not denying with prejudice the

20   bank's arguments or claims today; it's simply

21   deferring those to be asserted -- and they need

22   not be asserted at the time of the AP; it can be

23   asserted within two or three weeks if they wish

24   to bring an appropriate motion.

25             THE COURT:      So your

1    argument would be, then, if we forget the -- if

2    we ignore the fact that we have this stipulation

3    of dismissal pending and the debtor's motion in

4    that regard, and if we ignore the fact that

5    that's opposed by the banks and set that aside,

6    and look at this narrowly as if the only matter

7    before the Court were the matter of the

8    distribution of the funds with regard to which

9    the banks want a credit, that I can grant the

10   distribution of funds without a resolution of

11   the matter of the credit today?

12            MR. THOMAS:        By reserving

13   everyone's rights and remedies and making it

14   clear that that, in no way, a decision in that

15   regard is a decision that could be in any way

16   have collateral estoppel or some sort of effect

17   that the rights that the banks have sought today

18   were in some way denied or adjudicated; simply

19   that those can be brought back, even as part of

20   the pretrial people can set dates for those to

21   come back and be heard.

22            In addition, as a practical

23   matter, as a representative of the debtors as

24   well as the creditors' committees, at that point

25   in time, we do not have to be active in that, we

1    do not have to charge the estate for any

2    activities in that regard.  That really moves it

3    to the plane of a dispute between the Adelphia

4    debtors and the banks, and our hope is to get

5    this money out, in part, I must confess, because

6    people call me every day, since --

7              THE COURT:        Yes.

8              MR. THOMAS:      Thank you,

9    Your Honor.

10            THE COURT:       All right.

11    Does anyone else wish to make any further

12    comment?  All right.  I'm going to take five

13    minutes to formulate the language of a ruling.

14    I'll leave the people on the phone.  We'll go

15    off the record.  The speakers will be off in

16    chambers so that you can feel free to socialize

17    or whatever for five minutes.

18            (A recess was then taken.)

19            THE COURT:       Please be

20    seated.  Let's essentially call the roll and

21    make sure we didn't lose anyone along the way.

22    I see that we have Mr. Thomas and we have Ms.

23    Hill and Ms. Clemens, we have Mr. Brown,

24    Mr. Schlant, Miss Storie.

25            How about on the phone, do we have

1  Mr. Netzer?

2          MR. NETZER:      Yes, Your

3  Honor.

4          THE COURT:      Mr. Zinman?

5          MR. ZINMAN:      Yes, I'm here,

6  Your Honor.

7          THE COURT:      Ms. Keynes and

8  Mr. Salomon?

9          MR. SALOMON:      Yes, Your

10  Honor.

11          THE COURT:      Okay.  This is

12  my ruling.  I find that the only issue

13  appropriate for resolution today is the narrow

14  question of whether the distribution that was at

15  the heart of the plan and that was a highly

16  material element of this Court's approval of the

17  asset purchase, whether that distribution may be

18  ordered by this Court without any adjudication

19  of any other issue raised by any other party.

20          On that narrow issue, I rule that

21  there is no violation of due process and that

22  the distribution will go forward.  All other

23  issues raised by any other party will be

24  addressed hereafter in accordance with due

25  process and with statutes applicable and the

1   applicable rules, and it will be so ordered.

2   You will submit an order, Mr. Thomas?

3               MR. THOMAS:      Yes, I will,

4   Your Honor.  I'll certainly serve all other

5   counsel.

6               THE COURT:      Thank you.

7               MR. THOMAS:      May I ask a

8   procedural point?

9               THE COURT:      Yes.

10              MR. THOMAS:      While Your

11  Honor was absent from the bench, we noticed that

12  there was a pretrial on the same matters, but

13  everything on the pretrial was adjourned, merely

14  to set dates, and may we ask the Court, unless

15  the Court has issues to raise, may we merely set

16  dates now, instead of adjourning and going back

17  into chambers and coming back?

18              THE COURT:      Sure.

19              MR. THOMAS:      If it's all

20  right with other counsel.

21              THE COURT:      Let's move to

22  that now.  Now, the pretrial -- have counsel

23  agreed to the dates, or have counsel simply

24  agreed to address this?

25              MR. THOMAS:      We were hoping

1    Your Honor could pick a day that would be --

2    that these issues could be addressed other than

3    on the regular calendar, and unless there were

4    conflicts, we would accommodate whatever days

5    the Court has available in approximately

6    twenty-five to thirty days from now.

7          THE COURT:      Now, you're

8    referring to the other issues, the motion to

9    approve the stipulation and the motion -- and

10    the opposition thereto.  I granted the Fleet

11    Bank motion to intervene today, and so then we

12    had the cross motion, is it?

13          MR. BROWN:      We have a

14    motion by HSBC in the adversary proceeding to

15    enforce the plan.

16          THE COURT:      Right.  Yes.

17    The Adelphia waiver provision in the plan, is

18    that right?

19          MR. BROWN:      The avoidance

20    action waiver.

21          THE COURT:      Paragraph 7

22    dot 06?

23          MR. BROWN:      Yes, Your

24    Honor.

25          MR. ZINMAN:      Your Honor, if

1    I may.  It's Dan Zinman from Kasowitz again.  I

2    think one issue, procedural issue that needs to

3    be resolved is exactly how we're going to go

4    forward.  I don't know that it's the best idea

5    to argue everything at once.  I think, from my

6    point of view, I'd rather argue the juris-

7    dictional question first; if Your Honor doesn't

8    have jurisdiction, then a lot of the other

9    issues, vis-a-vis HSBC's motion for a permanent

10   injunction, would be kind of moot at that point.

11          THE COURT:          Okay.  I see

12   what you're saying.  Now, you're signatory to

13   the stip that would dismiss Adelphia out.

14          MR. ZINMAN:          No, I am not.

15   The creditor's committee I don't believe is

16   actually a signatory to that, although we are a

17   beneficiary to that.

18          THE COURT:          Okay.

19          MR. THOMAS:          Your Honor, we

20   have no objection that if the Court were to set

21   a date that parties, that other parties can

22   bring within the rules of this court for timing

23   whatever motions they feel are appropriate at

24   that time as well.

25          THE COURT:          That's a good

1  idea. Let's get everything out on the table. I

2  will continue my earlier pretrial order, which

3  tolled the running of all limitations, periods

4  and so forth, pending another date that we

5  should fix now for any other -- for the purpose

6  of submissions of anything else that people feel

7  needs to be on the table. And I'm not here

8  referring to briefs, because I don't think we

9  should be -- we will be briefing the whole

10  universe of issues here if we don't first decide

11  what is appropriate to take up here, and in what

12  sequence, so I'm not looking for briefs. I just

13  want to see if we need any more moving papers.

14           MR. ZINMAN:        Your Honor, I

15  assume that would not include our motion to

16  dismiss --

17           THE COURT:        You're

18  assuming that it would not include it?

19           MR. ZINMAN:        Yeah. If Your

20  Honor did want to brief that --

21           THE COURT:        Well, our

22  local rules don't require, perhaps unlike many

23  of the local rules that you're used to, don't

24  require a brief in connection with such motions.

25  Here regularly, the motion to dismiss, or the

1    motion for summary judgment is made and we don't

2    get the briefing until after we've had an

3    initial return date on the motion, if it's not

4    decided what needs to be briefed.

5              So no, I specifically would like a

6    motion, if that's your intention, I'd like a

7    motion to dismiss.  I want the moving papers on

8    the table, I just don't want -- I don't want

9    anyone to brief these issues until we see and

10   have on the table all of the conflicting

11   theories, okay.

12             So the question that I have is,

13   how long will it take -- what date would be

14   comfortable for everyone to have figured out

15   what motions they need to make and so forth,

16   recognizing that the opportunity to brief will

17   come later when I decide what needs to be

18   briefed and in what sequence.  Do you think

19   thirty days or sixty days?  I don't know, what

20   do you think?

21             MR. THOMAS:       The week of

22   May 3rd would be adequate for me; that's thirty

23   days out, roughly.

24             MR. BROWN:        That's

25   absolutely fine, Your Honor.  I'd like to join

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document , Page 55 of 65

1    the issue.

2                    THE COURT:        Sure.

3                    MR. ZINMAN:        Your Honor, if

4    I may.  Again, Dan Zinman.  My other question in

5    that regard is I have had long-standing vacation

6    plans for the last week in April.  So if we

7    could push it back one more week, I know my

8    family would be certainly grateful.

9                    THE COURT:        That's no

10   problem at all.  Why don't we, then, fix -- why

11   don't we say, then, that the deadline -- I want

12   to be careful that I don't accidentally create

13   problems if someone comes up with something

14   later.

15                    Let me ask that all the issues

16   that people believe are appropriate to have on

17   the table at the earlier stages, at the earliest

18   stages, should be filed and served no later than

19   noon on Thursday, May the 13th, and then we will

20   fix Thursday, May the 27th --

21                    MR. ZINMAN:        I'm sorry,

22   what time on the 20th?

23                    THE COURT:        I didn't say

24   the 20th.

25                    MR. THOMAS:        27th.  Two

1  seven.

2                  MR. ZINMAN:        I'm sorry.

3                  THE COURT:         The 27th.  So

4  I'd like to change that to Tuesday, May the

5  25th, Tuesday, May the 25th at ten A.M. would be

6  the return date and time here, in court, return

7  date and time to which I'm adjourning everything

8  that's pending and which you may use as the

9  return date for these other things.  But do get

10  them filed and served by noon on the, what did I

11  say, the 13th?  So that you have ample

12  opportunity to have some back and forth about

13  what you see as people file these things.

14                 MR. THOMAS:        Your Honor,

15  consistent with our earlier statement, I believe

16  that there would be no appearance by telephone

17  at that time?

18                 THE COURT:         On the 13th?

19                 MR. THOMAS:        On the 25th.

20                 THE COURT:         Oh, on the

21  25th.  I would prefer not.  I think it's --

22                 MR. BROWN:         I agree.

23                 THE COURT:         The reason

24  that I shifted it from the 27th to the 25th is

25  so that I can block out the whole day, and I

1  would hope that if need be, people could caucus

2  right here on the premises of the court and I'm

3  going to give you the whole day in hopes that we

4  can have a resolution of as much as is possible

5  on that day. Mr. Brown?

6           MR. BROWN:        I'm fully in

7  favor of that, Your Honor. I think it's a

8  terrific idea.

9           THE COURT:        Okay. So

10  you'll have my whole day on the 25th of May,

11  beginning at ten o'clock.

12           CHRISTINE KLIMKO: Can I just

13  clarify?

14           THE COURT:        Yes. Go

15  ahead.

16           CHRISTINE KLIMKO: This is going

17  to be the HSBC motion on the 7 point 06?

18           THE COURT:        All the

19  pending motions, yes.

20           CHRISTINE KLIMKO: And the

21  approval of the stip.

22           THE COURT:        That's right.

23  Those are all going to the 25th at ten.

24           MR. THOMAS:        We ask that

25  the pretrial be adjourned to the same date.

1          THE COURT:          The pretrial

2     is adjourned.  All time limits and limitations

3     with regard to whatever it was that I extended

4     before, I think there were -- I don't remember

5     why that was important, but I remember extending

6     it all to a pretrial, and they are similarly

7     extended.

8          MR. THOMAS:          Certain

9     parties haven't answered in reliance on my

10    submission, they would be dismissed.

11         THE COURT:          So all of

12    those time limitations and periods are extended

13    to that date and time.

14         MR. ZINMAN:          Your Honor,

15    again, Dan Zinman.  I apologize for my lack of

16    clarity with your practice --

17         THE COURT:          Sure.

18         MR. ZINMAN:          -- in your

19    court.  So we would file motions, but not

20    briefs, by the 13th?

21         THE COURT:          Correct.

22         MR. ZINMAN:          And so would

23    there be argument on the 25th, or --

24         THE COURT:          Yes.

25         MR. ZINMAN:          I'm not sure

1  what would happen.

2        THE COURT:        There would be

3  argument on the 25th. At least scheduling. If

4  you think -- the practice in our court,

5  typically, is for parties to return -- to come

6  back on an initial return date, let me know

7  what's really at issue. I've read the papers at

8  that point, I can ask questions, I can seek

9  clarification, we can agree on the way to

10  proceed on the issues and then I can order

11  briefing on what makes the most sense. That's

12  the way we usually proceed.

13        MR. ZINMAN:        I understand

14  now. Thank you.

15        THE COURT:        You're

16  welcome. Now, sometimes with representation of

17  this high quality, sometimes counsel -- I'm not

18  prohibiting briefs, but if you think that it's

19  very -- that it would be useful to you to have

20  other people see the strength of your argument,

21  fine, but I don't expect anyone to file

22  responsive briefs. And I do not want people

23  feeling, if someone were to submit a brief

24  because they think it would be useful to see the

25  strength of the legal argument, I don't want

1    someone saying, oh, gee whiz, they briefed that

2    question, so now I'm going to have to brief it.

3    No, that is not the case.

4            MR. ZINMAN:        I understand.

5            THE COURT:         Okay?  Great.

6    Yes, Mr. Schlant?

7            MR. SCHLANT:       I'm sorry, I

8    know everybody was about to go.  We had one

9    thing that was adjourned to today from

10   previously.

11           THE COURT:         What was that?

12           MR. SCHLANT:       It was the

13   motion of Fleet to enlarge the time to file its

14   proofs of claim.

15           THE COURT:         Oh, that's

16   right.  That's extended to the same date and

17   time.

18           MR. SCHLANT:       Okay.

19           THE COURT:         Is that right?

20           MR. SCHLANT:       Well, what we

21   had discussed the last time was there was no

22   opposition below the level of -- there was no

23   opposition by anyone that would not participate

24   in the segregated account if it were allowed to

25   be disbursed, and that if we reached a

1    resolution on allowing that to be disbursed,

2    then it would lead to a different way of looking

3    at the Fleet motion, and my understanding was at

4    this point, since the segregated account is

5    going to be paid out, there's really no

6    opposition to it.

7         THE COURT:         I tried to

8    avoid that question.  I think that probably I

9    have overruled on the objection because the

10   limited objections to disbursement said there

11   would be no objection if we got the credit.  I'm

12   saying that's not appropriately before me today

13   and that I can go ahead and order the

14   disbursement without granting that, so I don't

15   know how you want to characterize it.  It's fine

16   with me to characterize it as approving

17   disbursement over the objection of the banks.

18   You can decide whether that's what you want

19   to --

20        MR. THOMAS:        Mr. Schlant

21   and I will discuss it.  He's raising a slightly

22   different point, Your Honor.  His suggestion is

23   that having had the Court decide to make the

24   distribution free and clear of claims --

25        THE COURT:         Then there was

1    no opposition.

2                    MR. THOMAS:         -- then in

3    effect it's kind of moot, if it's important for

4    other reasons that Fleet have filed proofs of

5    claim, albeit late, as long as from the debtor's

6    point of view they don't interfere with the

7    distribution, then --

8                    THE COURT:         You're right.

9                    MR. THOMAS:         That's what I

10   believe the Court --

11                   THE COURT:         You're right.

12   I remember being briefly surprised that there

13   was no objection, but then I remembered that

14   what's going on up here is, vis-a-vis the one

15   point six million was very small potatoes in

16   comparison to the regards in which the banks are

17   similarly situated elsewhere.

18                   MR. THOMAS:         Mr. Schlant

19   and I will prepare an order and circulate it.

20   If none of the parties in interest have an

21   objection --

22                   THE COURT:         Then it's

23   granted.

24                   MR. THOMAS:         If they have a

25   claim, as long as it comes after the order

1  prohibiting distribution, then the debtors don't

2  object and I don't believe Mr. Brown objects.

3            THE COURT:        So the motion

4  to extend the time is granted, subject to the

5  language of an order to be circulated.

6            MR. SCHLANT:        Thank you.

7            THE COURT:        Among those

8  who want it.  Okay.  We're off the record.

9            (The proceedings concluded at

10  11:35 A.M.)

11

12

13                *     *     *     *

14

15

16

17

18

19

20

21

22

23

24

25

Case 1-03-10210-MJK,   Doc 492,   Filed 08/11/04,   Entered 08/11/04 15:44:05,
Description: Main Document  , Page 64 of 65

1       I certify that the foregoing is a correct

2   transcription of the proceedings recorded by me

3   in this matter.

4

5

6

7

8

_____

9   BARBARA BUYERS, CSR, RPR
Notary Public.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25